[No. 8,584.—Department One.]
November 27, 1882.

HELEN D. GRIDLEY, ADMINISTRATRIX OF THE ESTATE OF GEORGE W. GRIDLEY, DECEASED, *v.* JOHN BOGGS ET AL.

FINDING—SUBSTANTIAL CONFLICT IN EVIDENCE.—Action commenced by George W. Gridley in his life-time, prosecuted by plaintiff, appellant, as the administratrix of his estate, to obtain a decree setting aside a deed made by him September 4, 1879, to certain of the defendants (John Boggs, E. D. Pond, and C. W. Clarke), and also an accompanying contract executed by them declaring trusts in favor of named creditors of said George W. Gridley and one D. M. Reavis. The fraud charged upon the defendants especially named is, that taking advantage of the weak, feeble, and diseased condition of the mind of George W. Gridley, and of his consequent incapacity to protect his own interests, they induced him, by false representations, to execute the deed, and enter into the contract sought to be annulled. The representations were made concerning matters in respect to which Gridley was fully informed, and must have acted responsibly, provided he was a person of sound mind, on which question the Court below found in favor of the defendants on evidence in which there was a substantial conflict.

CROSS-EXAMINATION OF WITNESS.—An expert witness, called on behalf of
the plaintiff, had testified that he had made a *post mortem* examination
of the body of George W. Gridley, and as to the condition of the brain,
pelvic viscera, and particularly the kidneys and bladder, and the pros-
tate gland and the urethra; that he had found nitrate of urea in crystals
in washing the membranes of the brain, and crystals of urea in the arach-
noid sac, etc.; that the kidneys were apparently in the normal state, ex-
cept that they were engorged with blood; that the membranes of the
brain, the *pia mater*, the arachnoid and *dura mater* were "thickened, dis-
colored, adherent, and matted together;" that the prostate gland was en-
larged, thickened, and indurated, and its walls pressed together. In his
opinion, the deceased must have been of unsound mind for five or six years
prior to his death, by reason of the facts that the condition of the pros-
tate gland had obstructed the elimination of urea, causing it to enter in
the circulation, and poisoning the branial membranes, and that the pa-
tient died of uræmic convulsions, thus produced; that the thickened con-
dition of the brain coverings established insanity, and that the thicken-
ing produced by the chronic uræmatic poisoning must have been gradual,
continuing several years. One B., called as an expert witness by the de-
fendant, after stating that he had been a practicing physician and surgeon
since 1864, that he was a graduate of certain medical schools, and that he
had been superintendent for about two years of an insane asylum in Lan-
cashire, England, proceeded to testify, in effect, that he had never known
crystals of urea to be found in the brain or any of its surroundings;
that nitrate of urea is perfectly soluble in water; that uric and urea are
specifically different. He added, that taking the condition of the cover-
ings of the brain and the brain itself, and of the kidneys, the bladder,
the prostate gland, and the urethra, as described by M. (and Dr. C., who
assisted at the post-mortem), he could not understand how any such con-
dition of his brain or its membranes could be attributed to uræmic poi-
soning, without disease of the kidneys antedating it, and declared that
disease or unsoundness of mind could not be predicated on the condition
of the coverings of the brain as described by Messrs. M. and C. On cross-
examination of B., the plaintiff wished to put to him a hypothetical ques-
tion, in all respects similar to such questions propounded to plaintiff's
witnesses on direct examination.

*Held:* Since the testimony of B. on direct examination was confined to a
contradiction of the theory of M. as to the mental unsoundness of Grid-
ley produced by slow *uræmic* poisoning, the question was not proper
cross-examination, as the answer of the witness thereto, if it sustained
the plaintiff's views, would have constituted part of the plaintiff's case,
which should have been made out before she rested. Nor was the ques-
tion proper as testing the capacity of B.; for if the answer of B. had been
the same as that given by the plaintiff's experts it would have strength-
ened the plaintiff's affirmative case, if different it would have tended no
more to prove the incompetency of B. than it would have done to prove
the incompetency of the plaintiff's experts.

EVIDENCE—JUDGMENT REFUSING PROBATE OF WILL—HOW FAR CONCLU-
SIVE.—The plaintiff in the Court below offered to introduce in evidence
a document filed in the Superior Court on the fourteenth day of March,

1881, purporting to be the last will and testament of George W. Gridley, deceased, together with the objections to the probate of the same by Charles W. Gridley and Flora D. Harris, and the Court's findings of fact and conclusions of law thereon, and the decree of said Court thereon rejecting said will " and deciding that said George W. Gridley was unsound in mind, and incompetent by reason thereof to make a will at the date of the execution thereof, to wit, March 26, 1879." Upon the objection of the defendants the documents offered were excluded.

*Held:* The ruling was proper. The judgment of the Superior Court determined that a certain instrument, purporting to be the last will and testament of Geooge W. Gridley, was not his last will and testament. The proceeding was not a special inquiry to determine his *status* as to sanity or insanity. The finding of insanity was of a probative fact upon which the Court held the will to be invalid, as it might have held it to be invalid upon proof of duress or undue influence.

APPEAL by plaintiff from the judgment of the Superior Court of the County of Butte, and from an order denying a motion for a new trial. HUNDLEY, J.

Action to set aside a deed and contract on the ground of fraud. The facts are stated in the opinion of the Court. After the decision in department a petition for hearing in bank was presented and denied.

*York & Whitworth,* for Appellant.

The exclusion of proper testimony is error fatal to a judgment, and is always ground for reversal. (*Estate of Toomes,* 54 Cal. 516, 517; *Arthurs* v. *Hart,* 17 How. U. S. 6; *Barstow* v. *City Railroad Co.,* 42 Cal. 465; *Rice* v. *Heath,* 39 id. 611, 612; *Jones* v. *Young,* 28 Am. Dec. 569; Hilliard on New Trials, 408.)

This proposition is founded in reason, and its soundness is unquestioned. And, in Courts of equity particularly, where fraud and imposition upon one of weak mind are of the issues, any fact or circumstance which tends to show fraud, or to cast a suspicion of unfairness upon the transaction investigated, is relevant, material, and proper testimony. (*Tracy* v. *Craig,* 55 Cal. 91, 93, 94; *Tracy* v. *Colby,* 55 id. 67; *Moran* v. *Abbey,* 58 id. 167, 168; 1 Greenleaf's Ev., § 51, a; 1 Story's Eq., § 190; *Ingersoll* v. *Baker,* 21 Me. 474; *Trull* v. *True,* 33 Me. 367; *Burkholder* v. *Plank,* 67 Pa. St. 233; *Stewart* v. *Fenner,* 81 id. 180; 3 Wait's Actions and Defenses, 445, 446;

*Davis* v. *Calvert,* 25 Am. Dec. 282; *Pa., Del. and Md. Steam Nav. Co.* v. *Dandridge,* 29 id. 543.) Nor can it be maintained that the admission of the rejected evidence, in any given case, would not have changed the result, and that, therefore, no injury was done the appellants.

Injury will be conclusively presumed from such error. The adoption of any other rule would make the rights of litigants to depend upon the uncertainties of the most unreliable speculations. No one can, by any possibility, tell what might have been the result, in a given case, if the rejected testimony had been admitted, or to what other evidence it might have led, if it had been received. (*Arthurs* v. *Hart and Estate of Toomes, supra; Barstow* v. *City Railroad Co.,* 42 Cal. 465; *Jackson* v. *Feather River W. Co.,* 14 id. 24; *Rice* v. *Heath,* 39 id. 611, 612.)

The Court below in this case did exclude and refuse to entertain testimony, relevant, material, and proper, which the appellant, at the trial, sought to elicit and to introduce: 1. By sustaining defendants' objection to plaintiff's hypothetical question propounded to their own expert witness, Dr. C. F. Buckley, on cross-examination. This was a proper question. on cross-examination, for the reason that the witness had been introduced by the defendants as an expert on the subject of insanity, and in his direct examination had expressed his opinion that the pathological conditions found in the brain of the deceased upon a *post mortem,* and the fits with which deceased was afflicted, were not incompatible with mental integrity of every form, etc. (*People* v. *Lake,* 12 N. Y. 358; *Dilleber* v. *Home Life Ins. Co.,* 87 id. 83.)

The hypothetical question simply assumed the same facts upon which the witness had expressed his opinion, coupled with certain other facts, and asked his opinion upon them all taken together. The hypothetical question was a proper one as such. (*Cowley* v. *People of the State of New York,* 83 N. Y. 464; *Guiterman* v. *Liverpool etc. Co.,* id. 358; *Harnett* v. *Garvey,* 66 id. 641; *Negro Jerry* v. *Townshend,* 9 Md. 159.) And whilst an error in the assumption of facts would not make the interrogatory objectionable, so long as it is within the probable range of the evidence (*Harnett* v. *Garvey, supra*),

nevertheless in this instance the facts assumed had all been proven.

2. In sustaining defendants' objection to plaintiff's offer to introduce in evidence a document, filed in said Superior Court on the fourteenth day of March, 1881, purporting to be the last will and testament of said George W. Gridley, deceased, togther with the objections to the probate of the same by Charles E. Gridley and Flora D. Harris, filed in said Court on the sixth of April, 1881, and the Court's findings of fact and conclusions of law thereon, and the decree of said Court thereon rejecting said will and deciding that said George W. Gridley was unsound in mind, and incompetent by reason thereof to make a will at the date of the execution thereof, to wit, March 26, 1877.

This evidence should have been admitted. Here was the judgment of a Court that on a certain day, to wit, March 26, 1877, said Gridley was of impaired or unsound mind, to such an extent as to be, by reason thereof, incompetent to make a will. Evidence of the state of a person's mind before and after the act done is admissible to prove insanity. (2 Greenl. on Ev., § 371; *Estate of Toomes,* 54 Cal. 516, and cases cited.) The judgment was conclusive as to his condition on the day named. (Code of Civil Procedure, § 1908, Subd. 1.) It was at least *prima facie* evidence of his condition of mind on that day. (*Van Deusen* v. *Sweet,* 51 N. Y. 386; *Gibson* v. *Soper,* 6 Gray, 285–6; *Rippy* v. *Gant,* 4 Ired. (N. C.) Eq. 443; *Rider* v. *Miller,* 86 N. Y. 511; *Hicks* v. *Marshall,* 8 Hun, 329.)

*F. C. Lusk,* for all Respondents except C. E. Gridley.

*Belcher & Belcher,* also for all Respondents, except C. E. Gridley and D. M. and Ann E. Reavis.

Before proceeding to examine in detail the tedious list of exceptions specified under this head, amounting to nearly three hundred in all, counsel would submit that if any one of them were well taken, the error would not be a sufficient prejudice to the plaintiff to work a reversal of this case. The case shows no evidence to sustain the charge of fraud made by the plaintiff, and, on the issue of insanity, the preponderance is overwhelmingly with the defendants. In such a case, unless the error was one that might have materially injured the

plaintiff, a reversal will not be had. An inspection will satisfactorily show that the answer to any question objected to by appellant, if it had been excluded, or the admission of any answer that was excluded, could by no possibility have affected the result. If every ruling complained of had been in plaintiff's favor, the result could not have been changed. Of necessity the decision must have been for defendants.

Our Code has said, and this Court many times stated, that judgments will not be reversed for every error, but only for those where the party's substantial rights have been prejudiced.

The rule should be carefully applied in such a case as this. The trial was long, tedious, and very expensive, and after a careful and patient hearing and consideration, the learned Judge of the Court below found for the defendants. The case should not be sent back unless for weighty reasons. The record shows that a new trial could never terminate differently from the first. Counsel think none of the exceptions well taken, but if the Court in so great a number should discover any, we submit that they are entirely immaterial, and could not have damaged the appellant.

On this point we desire to call the attention of the Court to a late case in Michigan, *Fraser* v. *Jennison*, 42 Mich. 206, in which the issue was insanity. The result of a long trial was a decision in favor of the sanity of the party in question. Judge Cooley, in an elaborate opinion, reviewing the evidence, came to the same conclusion, but he discovered several exceptions in the admission or exclusion of evidence that he deemed well taken. After discussion, he came finally to the conclusion that the case ought not to be reversed on that ground, and on this point he said: "We have already said, that the Court erred in one instance in overruling questions, because they were leading, and in another because they called for conclusions and not facts. The Court also erred in holding that the questions put to Mary Colvin respecting family history, were objectionable, on the ground of being hearsay. It is that sort of evidence of all others that is not objectionable on this ground. (*Shields* v. *Boucher*, 1 De Gex & Smale, 40.) * * * The important fact they sought to bring out was that Mr. Fraser's mind weakened in the last year of his life;

and as they appear to have gone fully into the question of mental soundness, we must suppose this ground to have been covered. On the whole, we all agree that we ought not to reverse the judgment because of the rulings mentioned."

The alleged errors of this class will now be considered in detail, in the order specified by appellant. * * *

The question was not in cross-examination; nothing of that character had been asked on direct examination. It was an attempt to ask the question they had propounded to their own witness Shurtliff, as a part of their own case, on cross-examination of our witness, who was called only to disprove certain parts of Dr. Miller's testimony. He had on direct examination been asked no question as to the condition of Gridley's mind or his opinion of it. * * *

Gridley left a will. One of his family presented the will for probate, another objected to the probate on the ground that he was of unsound mind, and, without any contest, the family allowed the will to be set aside on that ground. Of course, the proceedings of the Probate Court in that regard were immaterial here and could not bind these defendants, nor affect them, for the reasons stated at the time, which were that the evidence was irrelevant and immaterial, so far as the judgment was concerned; that we were not parties to it, and could not be in any way bound by it; and that we could neither be bound by the findings nor the judgment; and that all the others papers offered in connection are incompetent to prove anything in this case as against the defendants. And further, that neither of the defendants were parties to or in any manner interested in the proceedings out of which that judgment arose; and that neither of the defendants were present at that proceeding, or had any right to or did cross-examine the witnesses therein produced.

McKINSTRY, J.:

The action, commenced by George W. Gridley in his lifetime, is prosecuted by plaintiff, appellant, as the administratrix of his estate, to obtain a decree setting aside a deed made by him September 4, 1879, to certain of the defendants (John Boggs, E. B. Pond and C.W. Clarke), and also an accompanying

contract executed by them declaring trusts in favor of named creditors of said George W. Gridley and one D. M. Reavis.

The complaint alleges that for more than five years next before the first day of December, 1880, George W. Gridley was continuously feeble and diseased in body, and feeble and weak and unsound in mind, and by reason thereof during all that time "wholly incompetent to transact business." That during such five years all the defendants had full knowledge of said Gridley's feeble and diseased condition of body, and his said weak and unsound condition of mind, and that he was so as aforesaid "wholly incompetent to transact business." That during said five years prior to December 1, 1880, and while the said defendants Boggs, Pond, Clarke and Reavis were each and all of them fully cognizant of said George W. Gridley's said weak, feeble and diseased condition of body and his said weak, feeble and unsound condition of mind, "and of his said incompetency to transact business," they conspired, confederated and colluded together to take an unfair and fraudulent advantage of him, "while in his said feeble and diseased condition of body, and while in his said weak, feeble and unsound condition of mind, and while he was so incompetent to transact business, to wrong, cheat, and defraud him out of his said property" (previously described), "and to that end, and with that intent, they wrongfully, fraudulently and falsely represented to said George W. Gridley that he was liable to pay to said Boggs, Pond, Clarke, and to certain other of the defendants, moneys due to them on certain promissory notes, all, or nearly all, signed by him and by said D. M. Reavis," etc.

The fraud charged upon the defendants especially named is, that taking advantage of the weak, feeble and diseased condition of the mind of George W. Gridley, and of his consequent incapacity to protect his own interests, they induced him, by false representations, to execute the deed and enter into the contract sought to be annulled.

The representations alleged to have been made to Gridley (with the exception, perhaps, of the alleged representation that Reavis had conveyed all this property to Boggs, Pond and Clarke, in reference to which the Court below found upon evidence that no such representation was made, but, to the contrary thereof, that the fact as to conveyance from Reavis

to Boggs, Pond and Clarke was stated to Gridley), had relation to matters in respect to which he was fully informed, and must have acted responsibly, provided he was a person of sound mind.

The Court below found: "For the five years next before the first day of December, 1880, the plaintiff's intestate, George W. Gridley, was not either feeble or diseased in body, or feeble, or weak, or .unsound in mind, and was not during all, *or any portion* of that time, incompetent to attend to, manage or transact business, but, on the contrary, was during all said time and up to the time of his death of sound, healthy and vigorous and unimpaired condition of mind and body, and fully competent to transact business."

It is admitted that as to this finding, there was a substantial conflict in the evidence.

In argument counsel indulged in much criticism, some of it perhaps just, of the findings. It is obvious, however, in presence of the explicit findings that Gridley was of sound mind, and further, that defendants practiced no such arts or devices as constitute fraud when practiced upon a person of sound mind, the judgment must be affirmed, unless *errors* occurred at the trial.

It is contended that the Court below erred in sustaining the objection to the hypothetical question propounded by plaintiff's counsel on cross-examination to the expert witness, Dr. C. F. Buckley.

Dr. P. B. M. Miller, an expert witness called on behalf of the plaintiff, had testified that he had made a *post mortem* examination of the body of George W. Gridley, and as to the condition of the brain, pelvic viscera, and particularly the kidneys and bladder, and the prostate gland and the urethra; that he had found nitrate of urea in crystals in washing the membranes of the brain, and crystals of urea in the arachnoid sac, etc. That the kidneys were apparently in the normal state, except that they were engorged with blood; that the membranes of the brain, the *pia mater*, the arachnoid and *dura mater* were "thickened, discolored, adherent, and matted together." That the prostate gland was enlarged, thickened, and indurated and its walls pressed together. In his opinion the deceased must have been of unsound mind for five or six

years prior to his death, by reason of the facts that the condition of the prostate gland had obstructed the elimination of urea, causing it to enter in the circulation and poisoning the branial membranes, and that the patient died of uræmic convulsions thus produced; that the thickened condition of the brain coverings established insanity, and that the thickening produced by the chronic uræmic poisoning must have been gradual, continuing several years.

In his direct examination on behalf of defendants, Dr. Buckley, after stating that he had been a practicing physician and surgeon since 1864, that he was a graduate of certain medical schools, and that he had been superintendent for about two years of an insane asylum in Lancashire, England, proceeded to testify in effect that he had never known crystals of urea to be found in the brain or any of its surroundings; that nitrate of urea is perfectly soluble in water; that uric and urea are specifically different. He added, that taking the condition of the coverings of the brain and the brain itself, and of the kidneys, the bladder, the prostate gland and the urethra, as described by Dr. Miller (and Dr. Caldwell, who assisted at the post-mortem), he could not understand how any such condition of his brain or its membranes could be attributed to uræmic poisoning, without disease of the kidneys antedating it, and declared that disease or unsoundness of mind *could not be predicated* on the condition of the coverings of the brain as described by Messrs. Miller and Caldwell.

It is apparent from the foregoing that the testimony of Dr. Buckley was addressed to the contradiction of the theory of Dr. Miller, that the diseased condition of the membranes of the brain was produced by slow uræmic poisoning, and such condition indicated insanity in Gridley, which extended backward from his death to a period of time including the acts alleged to have been done by him while incompetent to protect his business or other interests.

It is disputed between counsel for the respective parties whether there was any evidence in the case tending to prove some of the facts assumed to exist in the hypothetical question propounded, on the part of plaintiff, upon the cross-examina-

tion of Dr. Buckley, the sustaining of the objection to which by the Court below is now here urged as error.

After such examination as we have been able to give the enormous transcript of nearly *six thousand folios,* made up to a great extent of the questions and answers contained in the short-hand reporter's notes—and we consented to hear the appeal upon the unnecessarily voluminous record only out of consideration for the important interests involved—we are not prepared to say but there is to be found in it some evidence tending to prove the existence of each of the facts assumed in the question.

But the objection that the question could not be asked in accordance with any legitimate rule of cross-examination was properly sustained.

The burden of showing that George W. Gridley was insane when and before the instruments were executed, was cast upon the plaintiff. Taking up the burden and in making out her affirmative case, plaintiff, in addition to other evidence, had propounded a series of hypothetical questions to expert witnesses called on her behalf. The question put to Dr. Buckley was of the same character, and in substance the same as one put to plaintiff's witnesses, and his answer, if it sustained plaintiff's views, would have constituted part of plaintiff's case, which should have been made out before she rested. His direct examination had been limited to the expression of his opinion as to the correctness of the theory of Dr. Miller, one of plaintiff's witnesses, a theory based upon certain conditions of the bodily organs as the same appeared at the post-mortem. The question put by plaintiff was much broader than was justified by the matters drawn out on the direct examination. Nor can the question be justified as testing the capacity of the expert. If the answer of Dr. Buckley had been the same as that given by plaintiff's experts, it would have strengthened the plaintiff's affirmative case; if it had been different it would no more tend to prove the incompetency of Buckley than it would tend to prove the incompetency of the experts called by plaintiff.

Appellant also claims the Court below erred in sustaining defendants' objection to plaintiff's offer to introduce in evidence a document filed in the Superior Court on the fourteenth day

of March, 1881, purporting to be the last will and testament
of George W. Gridley, deceased, together with the objections
to the probate of the same by Charles W. Gridley and Flora
D. Harris, and the Court's findings of fact and conclusions of
law thereon, and the decree of said Court thereon rejecting
said will, "and deciding that said George W. Gridley was un-
sound in mind and incompetent by reason thereof to make a
will at the date of the execution thereof, to wit, March 26,
1879."

It is said the judgment was conclusive as to Gridley's
mental condition, or was at least *prima facie* evidence of his
mental condition on that day. Section 1908 of the Code of
Civil Procedure reads: "The effect of a judgment or final
order in an action or special proceeding before a Court or
Judge of this State or of the United States, having jurisdiction
to pronounce the judgment or order, is as follows: 1. In case
of a judgment or order against a specific thing, or in respect
to the probate of a will, or the administration of the estate
of a decedent, or in respect to the personal, political, or legal
condition of a particular person, the judgment or order is con-
clusive upon the title to the thing, the will or administration,
or the condition or relation of the person."

With respect to a judgment in a proceeding *de lunatico
inquirendo* it was said in *L'Amoureux* v. *Crosby* (2 Paige
Ch. 427), that as to the acts done by the lunatic before the
issuing the commission, and which were overreached by the
retrospective finding of the jury, the inquisition is only pre-
sumptive but not conclusive evidence of incapacity. It would
seem that as to acts done after the finding, the inquisition, in
the absence of the statute, would be only presumptive evidence.
(*Van Deusen* v. *Sweet*, 51 N. Y. 386; *Rider* v. *Miller*, 86 id.
511; *Gibson* v. *Soper*, 6 Gray, 285–6; *Rippy* v. *Gant*, 4 Ired.
Eq. 443; *Griswold* v. *Miller*, 15 Barb. 523, and cases there
cited.) But there can be no doubt, that, under the section of
the Code of Civil Procedure above quoted, the judgment in
a proceeding whose direct purpose and end is to obtain a
determination "of the personal, political, or legal condition of
a particular person" is conclusive upon such condition. Was
the judgment rejecting the will such a judgment?

Mr. Starkie says: "In many instances a court possesses a

jurisdiction which enables it to pronounce on the nature and qualities of the particular subject-matter, where the proceeding is, as it is technically termed, *in rem;* as where the Ordinary or Court Christian decides upon a question of marriage or bastardy; or the Court of Exchequer upon condemnations; or the Court of Admiralty upon questions of prize, or a Court of Quarter Sessions upon settlement cases. Decisions of this sort are for the most part binding and conclusive upon all the world." (Starkie Ev., p. 36, 10th Am. ed.) Such a judgment is conclusive unless impeached for fraud, on those who were neither parties nor privies to it. (Id. 384.) And the reasons given by Professor Greenleaf are : " These decisions are binding and conclusive, not only upon the parties actually litigating in the cause, but upon all others; partly upon the ground that in most cases of this kind, and especially upon cases of property seized or proceeded against, every one who can possibly be affected by the decision has a right to appear and assert his own rights, *by becoming an actual party to the proceedings ;* and partly upon the more general ground of public policy and convenience, it being essential to the peace of society that questions of this kind should not be left doubtful," etc. (1 Green. Ev., 525.)

If the defendants in the present cause are bound by the judgment of the Superior Court, as being a judgment declaring George W. Gridley to have been insane at the date of the offered will, it must be upon " the more general ground " mentioned by Mr. Greenleaf. Certainly all those who might be affected by a judgment that Gridley was insane when the will was executed, did not have the right to appear and assert their rights in the proceeding for the probate of the will. The legal notice of that proceeding ran only to those interested in Gridley's estate. And as to " the more general ground," public policy only requires, at most, that a judgment as to the *status* of a particular person, which shall be conclusive as against those not parties to it, shall be a judgment which simply determines such *status* in a proceeding whose sole end and aim is to determine it. The judgment of the Superior Court determined that a certain instrument, purporting to be the last will and testament of George W. Gridley, was not his last will and testament. The proceeding was

not a special inquiry to determine his *status* as to sanity or insanity. The finding of insanity was of a probative fact upon which the Court held the will to be invalid, as it might have held it to be invalid upon proof of duress or undue influence.

If there remains doubt of the correctness of this conclusion, it should be dispelled by the wording of the section of the Code of Civil Procedure. There a judgment "in respect to the probate of a will" is spoken of as a separate and distinct thing from a judgment "in respect to the personal, political, or legal condition or relation of a particular person." It would be difficult more explicitly to declare that a judgment in respect to the probate of a will should be evidence that the offered instrument had been rejected or admitted to probate—that it was or was not the last will and testament of the decedent—neither more nor less.

We find no substantial errors in the record.

Judgment and order affirmed.

ROSS and MCKEE, J.J., concurred.